Smith *vs.* Adam, (of color.)      Case 34.

APPEAL FROM LOUISVILLE CHANCERY COURT.      PET. EQ.

1. A deed purporting to emancipate a slave, since the passage of the Revised Statutes, is ineffectual for that purpose, unless proved or acknowledged in the county court, as required by the statute.— (*Chap.* 93, *art.* 9, *sec.* 1, *page* 643.)

2. Visits of short duration, or for a temporary purpose, made by a slave to a free state, though with the assent of the owner, have never been deemed sufficient to confer freedom on the slave, and in such case the negro is still a slave, and liable for his master's debts.

[The facts of the case are set out in the opinion of the court.—REP.]

*Pilcher and Hauser, and Boone and Pennebaker*, for appellants—

Argued—1. That the writing relied on by Adam as a deed of emancipation was ineffectual for that purpose, as it had not been proved or acknowledged in the county court in conformity to the statute. (*Rev. Stat. chap.* 93, *art.* 9, *sec.* 1, *page* 643.)

The act of the legislature provides, "that slaves 'may be emancipated by the owners in the follow- 'ing manner, and upon the following conditions, and 'not otherwise: 1. By deed acknowledged or proved 'by two witnesses in the county court. 2. By last 'will and testament, subject to the debts and liabili- 'ties of the owner, upon condition of their being re-

SMITH
vs.
ADAM.

'moved from and continued residence out of the State. 'The act of emancipation shall not vest the absolute 'right of freedom in the slave until after he shall 'have removed out of the state."

2. The act of the legislature is constitutional, the opinion of the chancellor to the contrary notwithstanding. (See *Jackson vs. Collins*, 16 *B. Monroe*, 218; *Isaac vs. Graves' ex'or. Ib.* 368.)

3. The act before cited, giving the power to emancipate slaves, says it shall not be done otherwise than as is prescribed by that. This will have the effect of preventing an emancipation by carrying into effect any foreign law that may be relied on as giving freedom. But we insist that Adam has not brought himself within the operation of any foreign law giving a right to freedom. It is not enough that Adam, on several occasions, has breathed the air of freedom in the state of Indiana. (*Graham vs. Strader*, 5 *B. Monroe*, 182; 7 *Ib.* 636; *Maria vs. Kirby*, 12 *Ib.* 545.) Nor does the act of Gray, the owner of Adam, in permitting him to go at large, and act as a free man, give him freedom.

The act of removal to a free state, which gives freedom, is a removal for residence by the owner, and taking the slave with him, as decided by this court, or permitting the slave so to remove. (*Rankin vs. Lydia*, 2 *Marshall*, 470; *Bush's ex'ors. vs. White*, 3 *Monroe*, 104; *Collins vs. America*, 9 *B. Monroe*, 569; *Ben. Mercer vs. Gilman*, 11 *Ib.* 211; *Terry vs. Street*, 14 *Ib.* 360; *Anderson vs. Crawford*, 14 *Ib.* 339.) It does not appear when the instrument relied on by Adam was executed. It was necessary to prove the date. (See *Kennaird vs. Daniel*, 13 *B. Monroe*, 501.

*Speed and Beattie*, for appellee—

The deed may be ineffectual to give freedom to the appellee; but we rely with confidence, that the fact that Adam was permitted by his owner to go to Indiana—a free state—and there to remain and trade, and act as a free man, did make him a free man.—

(See *Ben, of color, vs. Gilman,* 11 *B. Monroe,* 210; *Collins vs. America,* 9 *Ib.* 575; *Graham vs. Strader,* 5 *Ib.* 179.)

There is nothing in the constitution of Kentucky which forbids the owner of a slave sending him to a free state that he may be free, but the contrary is strongly implied.

If Adam became free from the fact of his going to Indiana with the consent of his former owner, and there remaining, trading, &c., it cannot be that he has become a slave by his return to Kentucky. He may have incurred the penalty imposed for returning, but he is not a slave.

The right of an owner of a slave to emancipate such slave is guaranteed by the constitution, and cannot be taken away by the legislature.

Gray's creditors could not have credited him with any eye to satisfying their debts by selling him, for he was free before the debts were created, and Gray has been guilty of no fraud in giving him his freedom.

The court is as much bound to declare Adam a free man as he is bound to leave the state.

Judge STITES delivered the opinion of the court.                    Jan. 20, 1858.

In January, 1854, Ormsby Gray, of Louisville, executed and delivered to his man Adam, a paper, purporting to be a deed of emancipation, but which had not been acknowledged by him, or proved in the county court as required by the Revised Statutes. (*Chap.* 93, *art.* 9, *sec.* 1, *page* 643.)

Adam continued to reside in Louisville, doing business and acting as a free man from the delivery of the deed up to March, 1857, and during this period was occasionally in Indiana. In March, 1857, the appellants, who were creditors of Gray, caused executions against him to be levied on Adam, and were about to have him sold, when he filed his petition, asserted his fredom, and relied on the foregoing facts to establish it.

SMITH
vs.
ADAM.

The chancellor held that he was free, and not subject to the payment of Gray's debts, and from that decision the creditors have appealed.

The Revised Statutes in the chapter and article *supra*, provide that "slaves may be emancipated by ' the owners in fee thereof, in the following manner, ' and upon the following conditions, *and not otherwise:* ' 1. By deed, acknowledged or proved by two sub- ' scribing witnesses in the county court. 2. By last ' will and testament. 3. Subject to the debts and ' liabilities of the owner. 4. Upon condition of their ' being removed from and continued residence out of ' Kentucky."

1. A deed purporting to emancipate a slave, since the passage of the Revised Statutes, is ineffectual for that purpose, unless proved or acknowledged in the county court, as required by the statutes. (*Chap.* 93, *art.* 9, *sec.* 1, *p.* 643.)

It is admitted, and obvious from the paper itself, that the deed of emancipation in this case is ineffectual to vest Adam with a right of freedom, because it has not been proved or acknowledged in the county court as required. And the only remaining question which is, in our opinion, necessary to be decided is whether the occasional visits of Adam to Indiana, since the execution and delivery of the deed, have had the effect to make him a free man ?

2. Visits of short duration, or for a temporary purpose, made by a slave to a free state, though with the assent of the owner, have never been deemed sufficient to confer freedom on a slave, and in such case the negro is still a slave, and liable for his master's debts.

Visits of a short duration, or for temporary purposes, made by a slave to a free state, with the assent of the owner, have never been deemed sufficient to confer freedom on the slave. The contrary has been repeatedly held by this court. But in such cases the contest has been between the owner and the slave claiming his freedom. Here the contest is not with the owner, for he disclaims title, but with the creditors of the owner, whose debts have accrued since his disclaimer. The question is, therefore, whether visits of the character proved, made with the assent of the master who has unequivocally indicated his intention to emancipate the slave, and permit him to go at large as a free man, can have the effect to liberate him in Kentucky, and thus divest his owner of any interest that can be reached by his creditors. Or, in other words, can a citizen of this state, by a deed of emancipation not made and proved in conformity

with law, and therefore ineffectual as such, make it effectual by permitting the slave, who is the subject of the deed, to go to, and return from, a free state as he may choose, the master and slave continuing to reside all the time in this state?

Prior to the constitution of 1850, and the adoption of the Revised Statutes, no doubt could have been entertained upon the question. The law then in force would have settled it at once in favor of the slave. But in our opinion the requisitions of the present constitution and the legislative enactments made in pursuance thereof, have changed the law, and demand a different response to the inquiry.

The 10th article of the Constitution provides, among other things, that "the general assembly shall have 'no power to pass laws for the emancipation of 'slaves without the consent of their owners, or with-'out paying their owners, previous to such emancipa-'tion, a full equivalent in money for the slaves 'emancipated, and providing for their removal from the 'state." And further, "They (the general assembly) 'shall pass laws to permit owners of slaves to eman-'cipate them saving the rights of creditors, and to 'prevent them from remaining in this state after they are 'emancipated." And in the next section of the same article, the general assembly are required "to pass 'laws making it a felony for free negroes thereafter 'removing to this state, or slaves thereafter emanci-'pated in this state, to refuse to leave the same, or 'those who have left to return and settle within the 'state," &c.

In view of these requisitions, and in order to effectuate them, the general assembly enacted the provisions of the Revised Statutes already mentioned, and furthermore passed laws making it a felony for free negroes to return to this state after having once left, or to refuse to leave, when migrating here after the law took effect. (Rev. Stat. 647.)

It is a part of the history of the state, and thus judicially known, that the chief causes which led to

the enactment of these stringent constitutional and legislative provisions was the rapid increase of that class of population within the state, and the evils to be apprehended therefrom. It was to prevent such increase that the constitution made it imperative upon the legislature to prevent slaves that might thereafter be emancipated from remaining in the state; and it was to thoroughly effectuate that end that the provisions of the Revised Statutes *supra* were adopted. The purpose of the framers of the constitution, as well as that of the legislature, is unequivocally indicated by the language of the provisions referred to.

Shall then this obvious intent be defeated by indirection? Shall emancipation be effected in Kentucky in another mode than that prescribed by the statutes? For such will be the result if the acts of Gray in this case, and the occasional visits of Adam to Indiana are deemed an effectual manumission of the latter.

Both now reside, and have resided, in Kentucky since the adoption of the Constitution and Revised Statutes. Adam claims his residence in Louisville, where he resided in 1854, when the paper relied on was made and delivered, and has never pretended to be a citizen, or rather a resident of Indiana.

The acts of Gray, in virtue of which Adam claims to be free, were performed in Kentucky—that is, his declaration of intention in writing no longer to claim him as a slave. For without such declaration, in writing or otherwise, it is not pretended that the casual or occasional visits of Adam to Indiana would vest him with freedom. It is the permission to go at large as a free man, and the visits to Indiana, though seldom and but of short duration, as the proof shows, that give him the right of freedom, if he has it.

If such effect is given to this permission and these visits—both owner and slave being residents of Kentucky—would it not be tantamount to saying that slaves may be emancipated in this state in another mode than that prescribed? This, it seems to us,

would be the inevitable result. And it is a result that we are unwilling to sanction because, in our opinion, it would be giving judicial approbation to acts inhibited by the statutes.

It is argued, however, by the learned and ingenious counsel for appellee, that the statutes making it a felony for free negroes to migrate to this state, or for slaves emancipated after its enactments to remain here or to return after having left, contemplate just such a case as this, and were intended to prevent slaves emancipated, as Adam is claimed to be, from returning. And in this view it is contended that Adam is in the eyes of the law a felon, and punishble as such for having returned hither from Indiana, or for refusing to leave.

This argument places Adam in rather an unfortunate position to ask the relief of the chancellor, but one that he does not, in our opinion, occupy.

If he was liable to prosecution under either provision of the Revised Statutes, *supra*, it must be under that applicable to slaves emancipated after the adoption of the Revised Statutes, for it is clear that he could not be liable under that section applicable to slaves migrating to this state, he having been always a resident thereof.

The 2nd section, however, makes it a felony for "any slave hereafter emancipated by the laws of this ' state to fail or refuse to leave the state as required ' by law," * * * "or having left the state to re- ' turn and settle within the same."

Now suppose Adam was indicted, as an emancipated slave, for violating this section, could he not truthfully say that he had not been emancipated by the laws of this state; that the deed or writing given him by his master was ineffectual to make him free; that he and his master were residents of Louisville, and had resided there before and since the law took effect, that he had not left the state in the sense contemplated by the statute, but that his home was then and always had been in Louisville, and that the law

authorizing emancipation had not been complied with in his case in any respect whatever? And would not this be a valid defense to the indictment?

If so, we would then, according to the argument, have the anomalous case of a slave emancipated in Kentucky whilst resident here; and, in disregard of the laws of the state, refusing to leave the same and remaining therein; and, when prosecuted for such violation of law, relying that he was not emancipated under the laws of the state; and, if prosecuted for migrating hither, saying that he always had resided here and was not an immigrant; and yet, when claimed to be a slave and subject to the payment of his owners debts, insisting that he is under the laws of the state a free man!!

Nothing would be easier than to defeat the intent and purpose of the statutory provisions referred to, if the effect be given to the acts of Gray and his slave that is contended for by the latter.

It would only be necessary, in order to evade the provisions of the law, and at the same time effect an emancipation of a slave residing in the state, to take him to the Ohio river, declare an intention to emancipate, and let him, under such declaration cross the river and visit for some period, however short, a state where involuntary servitude is inhibited, and return at his option and continue to reside in Kentucky. Such visitation would not change his residence from this state, nor amount to a departure contemplated by the law, neither could he be deemed an immigrant within the act prohibiting the migration of free negroes to this state.

It would be a virtual emancipation of the slave in Kentucky whilst both the owner and slave were resident citizens thereof, and in direct disregard of the statute.

If a person desires to emancipate his slaves in Kentucky he must conform to the requisitions of the law; it can be done in no other way.

This has not been done in the present case, and in our opinion Adam is still the property of Gray, and subject to the payment of his debts, and the judgment declaring him free is therefore deemed erroneous.

The judgment is *reversed*, and the cause remanded with directions to dismiss the appellee's petition, and for further proceedings not inconsistent with this opinion.